This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**No. A-1-CA-41341**

**STATE OF NEW MEXICO ex rel.**
**CHILDREN, YOUTH & FAMILIES**
**DEPARTMENT,**

  Petitioner-Appellee,

v.

**RAY B.,**

  Respondent-Appellant,

and

**TRISELA M,**

  Respondent,

and

**CHOCTAW NATION OF OKLAHOMA,**

  Intervenor,

**IN THE MATTER OF ESSII B. and**
**ELIAS B.,**

  Children.

**APPEAL FROM THE DISTRICT COURT OF LEA COUNTY**
**Lee A. Kirksey, District Court Judge**

Children, Youth & Families Department
Mary McQueeney, Chief Children's Court Attorney
Santa Fe, NM
K. Brandon Cline, Children's Court Attorney

Albuquerque, NM

for Appellee

Cravens Law LLC
Richard H. Cravens, IV
Albuquerque, NM

for Appellant

Laura K. Castillo
Hobbs, NM

Guardian Ad Litem

## DECISION

**BOGARDUS, Judge.**

**{1}** Respondent-Appellant (Father), father of E.B and E.B. (collectively, Children), appeals from the district court's adjudication of abuse and neglect. Children are eligible for membership in the Choctaw Nation of Oklahoma tribe,[1] and therefore, this case is governed by the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901-1963, the New Mexico Indian Family Protection Act (IFPA), NMSA 1978, §§ 32A-28-1 to -42 (2022, as amended through 2023), and the New Mexico Abuse and Neglect Act, NMSA 1978, §§ 32A-4-1 to -35 (1993, as amended through 2023). On appeal, Father argues the district court erred in finding that Children, Youth & Families Department (CYFD): (1) conducted active efforts to prevent the breakup of the Indian Children's family when CYFD removed Children from Maternal Grandmother's physical care, which resulted in harm to one of the children; and (2) showed clear and convincing evidence of good cause not to comply with placement preferences pursuant to ICWA and IFPA. We remain unpersuaded that Father has demonstrated error and therefore affirm.

## BACKGROUND

**{2}** CYFD received two referrals regarding allegations of physical and emotional abuse and neglect on January 18, 2023 and January 19, 2023, respectively. On January 18, 2023, Yvette Lucero (Ms. Lucero)—an investigator employed by CYFD and assigned to this case—met with Children's Mother and their Maternal Aunt, at Children's school. Ms. Lucero interviewed both. Mother disclosed to Ms. Lucero that she was under the influence of methamphetamines, smokes "meth" in the presence of Children, and fails to ensure that Children attend school. Mother also confirmed that Father lived with her and Children. In order to address the safety and risk to Children, Ms. Lucero

---

[1]On February 23, 2023, within twenty-four hours of discovering Children may be Indian Children, CYFD notified an Indian Child Welfare Social Worker of the pending investigation and of CYFD's intent to file the abuse/neglect petition (petition) involving Children.

offered to develop a safety plan with Mother and Maternal Aunt. According to the agreed upon safety plan, Children would reside with Maternal Aunt for the next five days, Mother and Children would be screened for drugs, Maternal Aunt would ensure Children attend school, and CYFD would possibly conduct a home visit. In accordance with the safety plan, Ms. Lucero referred Mother and Children for drug screening the next day.

**{3}** On January 19, 2023, Mother and Maternal Aunt met with Ms. Lucero at CYFD's office to provide Children with various necessities. At this time, Mother disclosed to Ms. Lucero that she "wielded a knife against [one of the Children] in a threatening manner." Mother's failure to appear for a scheduled drug screening that day prevented CYFD from obtaining mother's consent for Children's drug screen, even though Maternal Aunt and Children were present for drug screening. CYFD was unable to get in contact with Mother after the meeting on January 19, 2023.

**{4}** Without hearing back from Mother, on January 23, 2023, Ms. Lucero followed up with the case by going to Children's school. She discovered that Children were attending school but no longer living with Maternal Aunt. Instead, Children were living with their maternal grandmother, Maternal Grandmother "which was contrary to the agreed-upon safety plan."

**{5}** After being unable to get in contact with Maternal Grandmother "to assess the welfare and safety of Children," CYFD motioned for, and was granted, an ex parte custody order for custody of Children on February 28, 2023. In the order, the district court found that CYFD made "[r]easonable efforts . . . to prevent removal of [C]hildren from the home." The district court further found that Mother and Father "did not participate in the safety plan" and that Children "were moved from [M]aternal [A]unt's home prior to [CYFD] being able to assess the home for safety, and prior to the respondents having participated [in] or completed a safety plan." Thus, the district court found that it was "necessary for the children's protection that the children be placed in the legal custody of [CYFD]." Also on February 28, 2023, Father was named as a respondent in an abuse and neglect petition (petition) filed by CYFD, alleging that Children are abused and neglected children as defined by Section 32-A-2(B)(1), (B)(4), and (G)(2). CYFD was unable to contact Father until March 2, 2023.

**{6}** Children were in the physical care of Maternal Grandmother from approximately January 23, 2023, until March 1, 2023—the date that Children came into CYFD Custody. Children were placed in a non-relative, non-Indian foster placement on March 1, 2023. After March 1, 2023, upon Children coming into CYFD custody, drug tests were conducted on Children, Father, and Mother—all four members of the family tested positive for methamphetamines within the previous 90 days.

**{7}** A hearing was held on March 13, 2023, following the placement of Children in non-relative foster care. The next day, the district court entered a custody order finding, in part, probable cause to believe, as provided in Section 32A-4-18(C), Children "[were] in immediate danger from their surroundings, and removal from those surroundings

[was] necessary for [their] safety or well-being." The district court further found that "CYFD ha[d] made reasonable efforts to prevent the removal" of Children by putting a safety plan in place that Mother and Father failed to follow when they placed Children with Maternal Grandmother instead of allowing them to remain with their Maternal Aunt.

**{8}** This case came before the district court for an adjudication hearing on May 15, 2023—it lasted three days, concluding on June 26, 2023. At the time of the adjudication hearing, Children had been placed with paternal aunt, (Paternal Aunt and Paternal grandmother, Paternal Grandmother for approximately two weeks leading up to the final day of the adjudication hearing. Following the hearing, the district court entered an adjudicatory judgment and dispositional order (adjudicatory judgment), in which it found that Children were abused and neglected as to Father under Sections 32A-4-2(B)(1), (B)(4), & (G)(2).

**{9}** Father appeals.

**DISCUSSION**

**I.      The District Court's Finding that CYFD Made "Active Efforts" Required by ICWA § 1912(d) is Supported by Substantial Evidence in the Record**

**{10}** We begin by addressing Father's argument that the district court erred in finding that CYFD made active efforts to prevent the breakup of the Indian family, pursuant to ICWA when it removed Children from Maternal Grandmother's physical care. Specifically, Father argues that although CYFD "testified that it made several attempts to contact [Maternal Grandmother]" after Children were placed in her care, "the only specific date given for any attempted contact was February 28, 2023." Moreover, Father argues that "[d]espite the evidence of the children doing well in relative [Maternal Grandmother's] care, little evidence of attempts [by CYFD] to contact [Maternal Grandmother]," and no evidence CYFD reached out "to any other family member known to be in regular contact with [Maternal Grandmother]," CYFD authorities "took the [C]hildren into custody" and placed them with "non-relative and non-fictive kin." CYFD responds that Father incorrectly "focuses [solely] on [CYFD's] efforts to contact Maternal Grandmother," and that substantial evidence, including its efforts to contact Maternal Grandmother, supports the district court's finding that it made active efforts. We agree with CYFD.

**{11}** We note that Father only contends that CYFD failed to make active efforts at the point when Children were removed from Maternal Grandmother's physical care and placed into involuntary state custody. He makes no argument on appeal that CYFD failed to make active efforts to place Children with relatives at any other point during the course of the abuse and neglect proceedings below. Therefore, we limit our inquiry to whether substantial evidence supported the district court's conclusion that CYFD took active efforts to prevent the breakup of the Indian family at the time it removed Children from Maternal Grandmother's physical care.

**{12}** "When a petition for abuse and neglect seeking removal of an Indian child from the custody of their parent, legal guardian, or Indian custodian is filed by CYFD, . . . the district court must make the findings required by ICWA § 1912(d) at the adjudicatory hearing, including the finding that active efforts designed to prevent the breakup of the Indian family have been made." *State ex rel. Child., Youth & Fams. Dep't v. Eric E.*, 2024-NMCA-026, ¶ 28, 544 P.3d 307. This Court has previously defined "active efforts" as "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family." *State ex rel. Child., Youth & Fams. Dep't v. James M.*, 2023-NMCA-025, ¶ 19, 527 P.3d 633 (listing the types of active efforts required by ICWA) (internal quotation marks and citation omitted). "Th[is] definition of active efforts focuses on the timeliness of those efforts, provides that they be directed to maintaining the Indian child with their family, or, if a separation has already occurred, reuniting the child with their family, and specifies that efforts be conducted, to the maximum extent possible, in partnership with the Indian child's tribe and extended family." *Eric E.*, 2024-NMCA-026, ¶ 37. Moreover, the active efforts requirement insures "that the state agency work together with the child's tribe and extended family whenever possible, to evaluate the unique needs of that family, and then tailor the agency's efforts to the facts and circumstances of the case." *Id.* ¶ 38 (internal quotation marks and citation omitted). "[A]ctive efforts are intended to prevent the removal of an Indian child from their extended family and tribe." *Id.* ¶ 39. "The state agency cannot wait until the Indian child is taken into state custody, an adjudication obtained, and a treatment plan adopted, as often is the case under state law, to begin its efforts." *Id.*

**{13}** We review the district court's finding of active efforts for sufficiency of the evidence. *See id.* ¶ 42 ("[W]e review the findings of fact of the district court for sufficiency of the evidence, deferring to the district court's credibility determinations, and drawing inferences in favor of the district court's findings."). In doing so, we are mindful that CYFD is required to prove, by clear and convincing evidence at the adjudication stage, that it made active efforts to prevent the breakup of the Indian family. *See id.* ¶ 28 ("The required finding by the district court must either be based on clear and convincing evidence regarding the efforts CYFD has made, or on an admission by the respondent that those efforts have been made."); *see also James M.*, 2023-NMCA-025, ¶ 14 ("New Mexico law . . . allow[s] proof [of active efforts] by clear and convincing evidence at an adjudication involving an Indian child."). Therefore, our review on appeal is whether "viewing the evidence in the light most favorable to [CYFD], the [district court] could properly determine that the clear and convincing evidence standard was met." *Eric E.*, 2024-NMCA-026, ¶ 42. "To meet the clear and convincing evidence standard, the evidence must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact-finder's mind is left with an abiding conviction that the evidence is true." *Id.* (alterations, internal quotation marks, and citation omitted).[2]

---

[2]Father argues that the district court must find that CYFD made active efforts to prevent the breakup of the Indian family by evidence beyond a reasonable doubt. This is incorrect. The beyond a reasonable doubt standard applies only to hearings to terminate parental rights to an Indian child, *James M.*, 2023-NMCA-025, ¶ 14, whereas the clear and convincing standard applies at an adjudication hearing. *Id.*

**{14}**    In the underlying abuse and neglect petition, CYFD stated that it "made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family" by "attempt[ing] safety plans, request[ing] drug screenings, plac[ing] the [C]hildren with a relative . . . [h]owever, even though [Mother] agreed to participate in a safety plan, she did not participate" and CYFD was unable to get in contact with Father at the time. Moreover, CYFD alleged that Children's parents placed Children "in a situation that may endanger the [C]hildren's life or health" and requested that the "CYFD be given legal custody of [Children]."

**{15}**    At the conclusion of the adjudication hearing, the district court orally found that CYFD made active efforts to prevent the breakup of the Indian family, as there was testimony to support CYFD's efforts to help Maternal Grandmother with the placement process, testimony to support CYFD's efforts to reach out to other relatives, and finally that Maternal Grandmother failed to cooperate with CYFD to guarantee Children's safety. In the adjudication order, the district court found "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family" because "a safety plan was attempted [and] did not work [and CYFD made] active efforts to help [Maternal Grandmother] with paperwork [and] to reach out to other relatives to help with paperwork[, and finally that Maternal Grandmother] would not answer [the] door [for CYFD]."

**{16}**    We agree with the district court and conclude that significant testimony at the hearing supported its findings of active efforts made by CYFD before Children were taken into CYFD custody. First, there was uncontroverted testimony, presented through Ms. Lucero that established that she initiated a safety plan with Mother, but that the safety plan was not followed, that Children's family took it upon themselves to place Children with Maternal Grandmother who refused to cooperate with CYFD before Children were taken into CYFD custody, and that parents were entirely unresponsive to CYFD's communication attempts up until the point Children were taken into custody.

**{17}**    Ms. Lucero initiated the investigation on January 18, 2023—the same day she received the first referral regarding Children—by going to Children's school and meeting with both Mother and Maternal Aunt. Ms. Lucero contacted Maternal Aunt and asked that she provide assistance to contact Mother. Ms. Lucero testified that Maternal Aunt then brought Mother to the school that day and that she immediately attempted a safety plan with Mother in which both Mother and Maternal Aunt agreed that Children would stay with Maternal Aunt for five days. Despite the agreed upon safety plan, Ms. Lucero testified that when she attempted to check on Children at the expiration of the safety plan, she was informed by both Maternal Aunt and Children's school that Children had been moved to Maternal Grandmother's house without informing CYFD. To worsen matters, despite her multiple attempts, Ms. Lucero was unable to get in contact with either Mother or Father upon learning that Children were staying with Maternal Grandmother—she was only able to contact Father for the first time on March 2, 2023, a day after Children were removed from Maternal Grandmother's physical care.

**{18}**   Ms. Lucero further testified that she attempted to contact Maternal Grandmother several times, but Maternal Grandmother never answered the door. Specifically, Ms. Lucero testified that she went by herself to Maternal Grandmother's home several days before February 28, 2023 to make contact and after she was unable to do so, on February 28 she went to Maternal Grandmother's home with a police officer, but no one answered the door. She also went to Mother and Father's home but no one answered the door there either. Ms. Lucero attempted to call Maternal Grandmother several times, but again was unable to contact her. According to Ms. Lucero, she was never able to assess whether Maternal Grandmother's home was a safe environment for Children nor meet Maternal Grandmother, for that matter, before Children were taken into CYFD custody. Finally, Ms. Lucero stated that CYFD had concerns over placing Children with Maternal Grandmother in the first place because of Maternal Grandmother's own history with CYFD. In the initial custody order, the district court noted that Maternal Grandmother would not allow CYFD to assess her home, and expressed concern with her past history with CYFD.

**{19}**   Despite Father's argument that placement with Maternal Grandmother was made with approval of the entire family, the foregoing testimony as well as Sarah Boyd's (Ms. Boyd), supervisor of CYFD's placement unit, testimony that relatives must be licensed before placement—support CYFD's contention that it could not place Children with Maternal Grandmother without her first cooperating with CYFD's initial relative assessment process. Ms. Boyd testified that there is no way for a relative of Children to forego this required licensing process. It is uncontested that Maternal Grandmother failed to turn in the required placement application until May 11, 2023, approximately two months after Children had been removed from her care.

**{20}**   Next, there was testimony to support the various efforts that CYFD made to contact other relatives of Children for placement purposes at the time leading up to removal. Ms. Lucero testified that she found out Children were Indian children on February 28, 2023, and that she immediately notified Andrea Richards (Ms. Richards), the representative of Choctaw Nation, to inform her of Children's tribal affiliation. Moreover, Ms. Lucero stated that she attempted to contact other members of Children's family for placement purposes. She testified that she contacted Maternal Aunt who refused to be placement for Children leading up to the time Children were placed into CYFD custody, because she wanted placement with Maternal Grandmother. She also contacted Paternal Grandmother and Paternal Aunt to assess placement possibility but because they lived at a group home at that time, she did not consider placement with them because everyone at the group home would have to have a background check and it would be an extensive process to approve placement there. However, Ms. Lucero testified that she and Paternal Aunt discussed the possibility of she and Paternal Grandmother moving into an apartment and then reassessing Children living with them at that time.

**{21}**   Additionally, Ivelina Mitranhova (Ms. Mitranhova), a CYFD permanency worker assigned to this case, confirmed Ms. Lucero's testimony that CYFD contacted Paternal Aunt and Paternal Grandmother regarding placement of Children, and that CYFD had

considered placing children with them, but that Paternal Aunt and Grandmother were residing in a group home and were looking for a house to move into. Ms. Mitrannhova also testified that she believed the group home environment would not be an appropriate placement for Children.

**{22}** Next, Andrea Richards (Ms. Richards), a qualified expert witness pursuant to ICWA, and the Choctaw Nation representative assigned to this case testified that she received weekly contact from CYFD via both phone calls and emails since the case began. She further testified that, based on her knowledge of the underlying factual circumstances, she believed CYFD made active efforts to prevent the breakup of this Indian family by attempting a safety plan and assisting with services before removal. Ms. Richards stated that the safety plan was not kept in place and lapsed due to the inability to communicate with Father and Mother. Finally, Ms. Richards agreed that good cause to deviate from placement preferences existed—she also noted that she approved of the placement of Children in non-relative foster care at that time.

**{23}** On the final day of the adjudication hearing, Paternal Aunt testified that she and Paternal Grandmother had recently obtained housing, were no longer living in the group home, and that Children had been placed with them for the past two weeks. She further testified that she was aware CYFD had difficulty contacting Maternal Grandmother leading up to the removal of Children and that she could have done nothing more herself than knock on the door as CYFD did.

**{24}** The forgoing testimony demonstrates that CYFD made multiple attempts to contact Maternal Grandmother, Mother, and Father before placing Children into CYFD custody. It also establishes that CYFD reached out to several family members attempting to find placement for Children. It shows that, despite these efforts, Maternal Aunt declined to take Children, and that placement with Paternal Aunt and Paternal Grandmother was not feasible at that time given the extensive background checks that would have to take place. Finally, it showed that CYFD continued a line of communication with Paternal Aunt and Paternal Grandmother regarding placement, and that Children were eventually placed with them upon their finding housing outside of the group home. As the district court found in the adjudication order, at the time of final day of the adjudication hearing, placement of Children "follow[ed] the placement preferences established by ICWA and applicable regulations" because Children were placed with a member of their extended family.

**{25}** Given the nature of the underlying allegations—which were duly noted by the district court in the adjudication order—of Mother putting a knife to one of the Children's throats, both Mother and Father smoking methamphetamines in the presence of Children, Children testing positive for methamphetamines, and the failure of Mother, Father and Maternal Grandmother to communicate with CYFD leading up to March 1, 2023, we conclude that CYFD established by clear and convincing evidence that it made active efforts to prevent the breakup of the Indian family, as required by ICWA, before taking them into state custody. Therefore, the district court did not err.

## II.       Deviation From the Placement Preferences Was Supported by Good Cause

**{26}**     Father further argues that the district court's determination that good cause existed to deviate from ICWA placement preferences when CYFD removed Children from the physical care of Maternal Grandmother on March 1, 2023, was not supported by the evidence and that Children were harmed thereby when one of the children was assaulted in the non-relative foster home by another foster child.. Father also asserts that the district court "orally ruled that there was good cause to ignore ICWA placement preferences due to the eventual placement with family but did not provide findings of fact in the [a]djudication [o]rder on whether" good cause existed to removed Children at that time. We are not convinced that the district court erred.

**{27}**     As an initial matter, the district court made a written finding regarding good case in the custody order filed on March 14, 2023—which Father fails to cite to or acknowledge in his briefing to this Court. *See* § 32A-28-21(M)(3) (stating a district court's "determination of good cause to depart from the placement preferences shall be made in writing and be based on the considerations set forth by" IFPA). The district first heard evidence related to the departure from placement preferences at the initial custody hearing that took place on March 13, 2023, soon after Children were taken into state custody. Following the hearing, the district court issued a custody order finding that CYFD "ha[d] proven by clear and convincing evidence that there is good cause to depart from the placement preferences established by" IFPA. The district court specifically found that good cause existed to depart from placement preferences because Paternal Aunt and Paternal Grandmother were, at the time, living in a sober living facility and that no home with tribal affiliation had yet been identified by CYFD. Father raised the issue of good cause again at the time of the adjudication hearing—he orally argued, that good cause did not exist to remove Children from Maternal Grandmother and that CYFD had no basis to remove Children from Maternal Grandmother. In response to Father's argument, the district court orally reaffirmed its initial finding—made in the custody order filed on March 14, 2023—that good cause existed to remove children from Maternal Grandmother's physical care and to place them into CYFD custody. The district court made no further written finding concerning good cause in the adjudication order.

**{28}**     "The determination of good cause to deviate from ICWA placement preferences is a legal standard." *State ex rel. Child. Youth & Fams. Dep't v. Casey J.*, 2015-NMCA-088, ¶ 24, 355 P.3d 814. "Accordingly, we must determine whether the facts, as found by the trial court and as supported by evidence in the record, are legally sufficient to establish 'good cause' to depart" from placement preferences. *Id.* (internal quotation marks and citation omitted). We do not re-weigh the evidence on appeal—"rather, we view the evidence in the light most favorable" to CYFD as the prevailing party. *See id.* (internal quotation marks and citation omitted).

**{29}**     Here, CYFD does not dispute that Children were initially not placed in a preferred placement since they were placed in non-relative foster care—it only contends that good cause existed to depart from preferred placement preferences. ICWA, IFPA, and

the New Mexico Abuse and Neglect Act specify foster care placement preferences for Indian children. *See* § 1915(b); § 32A-28-1(A); *see also* § 32A-4-9(A). Pursuant to IFPA, "[a]n Indian child shall be placed in accordance with the placement preferences unless there is good cause to depart from the placement as determined by the court after a hearing." Section 32A-28-21(M). The party seeking to depart from placement preferences "has the burden of proving by clear and convincing evidence that there is good cause to depart from the preferences." Section 32A-28-21(M)(2). IFPA itself does not provide a definition of "good cause." *See* § 32A-28-2 (providing a list of definitions as used in IFPA). However, this Court has previously stated that a determination of good cause not to follow placement preferences should be based on one or more of the following considerations: "a request of the biological parents or the child when the child is of sufficient age; the extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness; and the unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria." *See Casey J.*, 2015-NMCA-088, ¶ 18 (internal quotation marks and citation omitted); *see also* Rule 10-318(E) NMRA (listing permissible consideration for determining whether good cause exists to depart from placement preferences).

**{30}**   Before Children were placed into CYFD custody and then into non-relative foster care, CYFD made repeated attempts to contact Mother, Father, and Maternal Grandmother but they failed to cooperate. Moreover, there was testimony that established that, despite CYFD's various attempts to find a placement with Children's extended family members, there was a lack of availability of suitable placement for Children meeting the preference criteria at the time Children were placed into CYFD custody. *See* Rule 10-318(E)(5) NMRA (stating "the unavailability of a suitable placement after a determination by the court that a diligent search was conducted to find suitable placements meeting the preference criteria, but none was located."). Finally, the representative of the Choctaw Nation, Ms. Richards, testified that she believed there was good cause to depart from placement preferences given the underlying factual circumstances. Viewing this evidence in a light most favorable to CYFD, we conclude that the district court did not err in finding that good cause existed to depart from placement preferences. *See Casey J.*, 2015-NMCA-088, ¶ 24.

**CONCLUSION**

**{31}**   For the foregoing reasons, we affirm.

**{32}**   **IT IS SO ORDERED.**

**KRISTINA BOGARDUS, Judge**

**WE CONCUR:**

**JACQUELINE R. MEDINA, Judge**

**MEGAN P. DUFFY, Judge**